301 So.2d 637 (1974)
STATE of Louisiana
v.
Ellen McDaniel FLOOD.
No. 54498.
Supreme Court of Louisiana.
October 11, 1974.
Rehearing Denied November 6, 1974.
*640 Nathan S. Fisher, Williams & Fisher, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Norval J. Rhodes, Dist. Atty., James L. Alcock, Asst. Dist. Atty., for plaintiff-appellee.
MARCUS, Justice.
Ellen McDaniel Flood was indicted for the murder of her husband, Richard Flood. R.S. 14:30. She was convicted after a trial by jury and sentenced to life imprisonment. Defendant appeals to this Court.
Richard Flood was admitted to Terrebonne General Hospital on June 1, 1972 at about 1:40 p. m. complaining of severe abdominal pains accompanied by intense vomiting. On the next day, June 2, at about 2:30 p. m., Richard Flood died. He was administered to by Drs. Herman and Leslie Walker. An autopsy was performed, and the cause of death was listed as acute pulmonary edema. Prior to the autopsy, Dr. Leslie Walker requested that sample tissue of certain body organs be retained for subsequent analysis. The excised body organ samples, a toenail and hair clippings, and five tubes of blood taken from the deceased, were ultimately analyzed at the Louisiana State Police Crime Laboratory. All were found to contain a very high lethal concentration of arsenic. Thereafter, Ellen McDaniel Flood was arrested on August 14, 1972 and charged with the murder of her late husband. A search warrant issued (August 14, 1972) for a search of the trailer in which she resided with her deceased husband until his death. Six medicine bottles were seized.[1] Analysis revealed a small concentration of arsenic in the contents of these bottles.
An indictment was returned by the Terrebonne Parish Grand Jury on August 25, 1972, charging Ellen McDaniel Flood with the murder of her husband by arsenic poisoning.
Bill of Exceptions No. 3 (Specification of Error No. 1)[2] raises the correctness of the ruling of the trial judge denying defense motion to suppress the items seized in the search of defendant's home on the ground "that said search and seizure was made in contravention to the guidelines set out for procuring a valid search warrant."
Constitutional provisions insure a person from unreasonable search and seizure of his house, papers and effects. No such search or seizure shall be made except upon warrant issued upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. Article I, Section 7, Louisiana Constitution; Amendment IV, United States Constitution. Conformably, our Code of Criminal Procedure in Article 162 provides:
"A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant.

*641 "A search warrant shall include a reasonable description of the things to be seized. When a warrant authorizes the search of a place, it shall designate the place to be searched. When a warrant authorizes the search of a person, it shall name or describe the person to be searched."
It is well settled that the affidavit must recite facts establishing to the satisfaction of the judge, not the affiant, that probable cause exists for the issuance of the search warrant. State v. Paciera, 290 So.2d 681 (La.1974); State v. Holmes, 254 La. 501, 225 So.2d 1 (1969); State v. Wells, 253 La. 925, 221 So.2d 50 (1969).
The factual information which is the foundation for the determination of probable cause must be contained in the affidavit. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Article 162 C.Cr.P. Mere suspicion or belief is not sufficient. Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933); Aguilar v. Texas: State v. Wells.
With these pronouncements in mind, the recitals of the affidavit which served as the basis of the application for the search warrant later issued and executed by Detective David Yelverton of the Police Department of the City of Houma must be considered. This affidavit recites in pertinent part:
"That a search warrant should issue for a cream colored, trimmed brown house trailer located in Maplewood Trailer Park, at Route 2, Box 400, Maplewood Drive, Coteau Road, Houma, Louisiana, being occupied by one, Mrs. Ellen McDaniel Flood, in the Parish of Terrebonne, Louisiana, for the purpose of seizing any and all chemical substances possibly containing arsenic.
"The reasons and facts for the request of this search warrant are: That on June 2, 1972, in the City of Houma, Louisiana, one, Richard Alvin Flood, Husband of the said Mrs. Ellen McDaniel Flood, died at Terrebonne General Hospital of acute pulmonary Edenma, [sic] as determined by Dr. Leslie Walker, attending physician at time of death. That on August 4, 1972, the results of a laboratory examination made by Doris C. Muller, Criminologist for the Louisiana Department of Public Safety, State Police Crime Laboratory, Baton Rouge, Louisiana, indicated a high concentration of arsenic in the body organs and blood of the late Richard Alvin Flood. That on August 14, 1972, after an extensive investigation by the Houma Police Department and the Terribonne Parish Sheriff's Office, an affidavit was filed by affiant charging the said Mrs. Ellen McDaniel Flood with the murder of her late husband, Richard Alvin Flood.
"That affiant has reasonable grounds and probable cause to believe that there is now being concealed in the above described house trailer, all or part of chemical substances containing arsenic, which said property constitutes evidence of the commission of the crime of murder as set forth in the Louisiana Revised Statutes, and that your affiant requests a Warrant of Search to issue herein for the purpose of allowing your affiant to search the said premises for the purpose of locating, if possible, the same, or any part of said chemical substances possibly containing arsenic."
The issuance of the search warrant and the ensuing search is assailed in this case upon the following grounds: (1) the affidavit does not contain sufficient facts to satisfy the requirements that probable cause existed for the issuance of the warrant; (2) the classification of the items listed in the search warrant as the object of search is so broad as to allow the police to seize almost anything found in the trailer; and (3) the issuing judge went outside the four corners of the affidavit to determine if probable cause existed, which is in direct contravention of Article 162 C.Cr.P.
*642 The first argument that the affidavit fails to state sufficient facts to satisfy the "probable cause test" is without merit. We must bear in mind that this is a prosecution of a wife for the murder of her husband by arsenic poisoning. The evidence in such a case, as here, is usually circumstantial. Generally, the complaint lodged against the affidavit is that it sets forth mere suspicions, beliefs, opinions and conclusions. Here, the affidavit sets forth facts. It specifically states that Mrs. Flood's husband died on June 2, 1972 of acute pulmonary edema which cause of death was determined by Dr. Leslie Walker, attending physician, at the time of death; that, on August 4, 1972, results of laboratory examination made by the Louisiana Crime Laboratory indicated a high concentration of arsenic in the body organs and blood of her deceased husband; that, on August 14, 1972, after extensive investigation by the Houma Police Department (of which affiant was a member) and the Terrebonne Parish Sheriff's Office, an affidavit was filed by affiant charging Mrs. Flood with the murder of her late husband.
Aguilar recognized that an affidavit may be based on hearsay information and need not reflect the direct personal observation of the affiant so long as the magistrate is informed of some of the underlying circumstances supporting the affiant's conclusions and his belief that the informant involved, whose identity need not be disclosed, was credible or his information reliable. However, here the affiant asserts facts and information resulting from an investigation by the police department of which he is a member. As a matter of fact, he is the person who filed the affidavit charging Mrs. Flood with the murder of her husband.
After reviewing the jurisprudence in regard to the issuance of a search warrant, the United States Supreme Court in United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), stated:
"These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements, of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."
Recently, in State v. Paciera, 290 So.2d 681, 687 (La.1974), we stated:
"As Spinelli observed, `in judging probable cause magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense' and `their determination of probable cause should be paid great deference by reviewing courts.' 393 U.S. [410,] 419, 89 S.Ct. [584], 590, [21 L.Ed.2d 637]. Further, where the law enforcement officers have respected the constitutional mandate to secure a warrant before searching, `Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' Ventresca, at 380 U.S. 109, 85 S.Ct. 746. See also Jones at 362 U.S. [257,] 270, 80 S.Ct. 725, 735-736 [4 L.Ed.2d 697]."
We are satisfied that there are sufficient facts contained in the affidavit herein for the judge to have determined that there was probable cause for the issuance of the search warrant.
Counsel for defendant also raises the issue of staleness in that the crime occurred *643 on June 2, 1972, eighty-three days prior to the issuance of the search warrant on August 14, 1972, citing State v. Bastida, 271 So.2d 854 (La.1973) and State v. Hightower, 272 So.2d 363 (La.1973). The remoteness of the facts used to justify the issuance of a search warrant must be determined by the facts and circumstances of each case. Here, the laboratory report showing arsenic in the body organs and blood of the decedent was not received until August 4. An extensive investigation followed. A charge was filed against defendant on August 14, the date of the affidavit and the date on which the search warrant was issued. Hence, we conclude that the remoteness has no bearing on the determination of probable cause in the instant case and therefore this contention is without merit.
The second attack upon the search warrant is that it failed to satisfy the first sentence of the second paragraph of Article 162 C.Cr.P.: "A search warrant shall include a reasonable description of the things to be seized." Counsel argues that in the instant case, the thing to be seized "all or part of chemical substances possibly containing arsenic" is too general and vague. This contention lacks substance. The affidavit seeks to search the premises for the purpose of locating "any part of said chemical substances possibly containing arsenic." The warrant so issued allowed a search for "all or part of the chemical substances possibly containing arsenic which she used to murder her husband, Richard Alvin Flood, on June 2, 1972.... " The search for "chemical substances possibly containing arsenic" is not so broad as to render the warrant illegal. As a matter of fact, it would have been difficult to arrive at a more specific description. Thus, we conclude that the search warrant contained a "reasonable description of the things to be seized" under Article 162 C.Cr.P.
The last contention is that the motion to suppress should have been granted because the issuing magistrate went outside the four corners of the affidavit in determining probable cause. Counsel refers to the statement in the search warrant in which Judge Marcel states:
"In addition to considering the affidavit of said officer, the undersigned Judge has interrogated the said officer, under oath, and from his answers to the questions asked by me, Judge, and the information obtain therefrom, I am satisfied that there is probable cause and reasonable grounds to believe that the aforesaid property is being concealed in the above described house trailer * * *"
This argument is without merit for the reason that the affidavit recites sufficient facts for probable cause. Resort need not be made to the statement of Judge Marcel in the warrant that he interrogated Detective Yelverton and ascertained information from him. Thus, the interrogation by Judge Marcel was mere surplusage.
For the foregoing reasons, we find Bill of Exceptions No. 3 to be without merit.
Bill of Exceptions No. 5 (Specification of Error No. 2) was taken to the denial of the motion to quash by the trial judge. Defendant alleged that members of the female sex were and have been arbitrarily and capriciously excluded from service on the grand and petit juries, thereby denying her, a female, the right to a fair cross-section of the community to which she is entitled under the due process clause of the Louisiana and the United States Constitutions. She further avers that she, as a member of the female sex, has been denied her rights guaranteed by the equal protection clause of the Fourteenth Amendment of the United States Constitution.
This Court has consistently upheld our constitutional (Article VII, Section 41) and statutory (Article 402 C.Cr.P.) law exempting women from jury service as not *644 violative of the due process and equal protection clauses. State v. Washington, 292 So.2d 234 (La.1974); State v. Leichman, 286 So.2d 649 (La.1973). Likewise, we rejected the same contention of a women defendant indicted for murder in considering her motion to quash on the ground that women were excluded from jury service in State v. Stevenson, 292 So.2d 488 (La.1974).
Bill of Exceptions No. 5 is without merit.
Bill of Exceptions No. 8 (Specification of Error No. 3) complains of the trial judge's denial of defendant's motion for a change of venue. This motion avers that, due to the widespread publicity given through the news media to defendant's arrest, her indictment and alleged evidence against her contained in attached news clippings, there was such prejudice in the public mind that a fair and impartial trial could not be obtained in Terrebonne Parish. A change of venue was sought to a parish where prejudice did not exist.
Although this motion was filed on the trial date, the judge permitted it to be filed. See Article 621 C.Cr.P. The ruling on this motion was deferred until the conclusion of the voir dire examination. Thereafter, the judge denied the motion.
The grounds for change of venue are set out in Article 622 C.Cr.P. as follows:
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
"In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
To warrant a change of venue, the burden is upon the defendant to establish that he cannot obtain a fair trial in the parish where the prosecution is pending. State v. Leichman, 286 So.2d 649 (La.1973); State v. Richmond, 284 So.2d 317 (La.1973); State v. Foy, 278 So.2d 38 (La.1973); State v. Green, 275 So.2d 184 (La.1973); State v. Curry, 262 La. 280, 263 So.2d 36 (1972); State v. Poland, 255 La. 746, 232 So.2d 499 (1970). Further, the Article requires a showing of more than mere knowledge by the public of facts surrounding the offense. It requires, in addition, proof of such prejudice in the public minds that a fair and impartial trial cannot be obtained in the parish.
In the instant case, defendant has failed to meet the burden of proof. Her evidence consisted of four news articles,[3] none of which were inflammatory in nature nor did they reveal any facts of the case. The voir dire examination was extensive in this regard and in no way could it be concluded that the publicity given through the news media in any way created prejudice to the extent of warranting a change of venue. While many of the prospective jurors admitted that they had either heard of or read about the murder, none of them testified that they had a pre-conceived notion of defendant's guilt or innocence or had acquired any knowledge of the facts of the case from the news media. This is readily understandable in view of the limited coverage and the time element between the crime (June 2, 1972) and the date of trial (May 29, 1973).
The granting or denial of change of venue rests within the sound discretion *645 of the trial judge and his ruling denying the motion will not be disturbed unless evidence affirmatively shows that the ruling was erroneous and an abuse of judicial discretion. State v. Richmond, supra; State v. Didier, 273 So.2d 277 (La.1973); State v. Poland, supra. Under the evidence presented to support the motion for change of venue, it cannot be said that the trial court abused its discretion.
Bill of Exceptions No. 8 is without merit.
Bill of Exceptions No. 10 (Specification of Error No. 4) deals with the question of whether the defense was denied full access to the physical evidence for the purpose of an independent examination for arsenic, contrary to the order of this Court issued March 1, 1973, conformably with State v. Migliore, 261 La. 722, 260 So.2d 682 (1972).
This bill grew out of interrogation of Detective Yelverton regarding the items seized from the house trailer of the defendant pursuant to the search warrant, specifically six medicine bottles found to contain small quantities of arsenic.
Defense counsel objected that certain items were not allowed to be examined by a defense expert witness. Some parts of the body of deceased (kidney, liver, heart, brain, spleen, blood, toenail and hair) had been sent to the police crime laboratory for testing along with the six medicine bottles taken from the trailer. It is defendant's contention that her expert, Dr. Terrance Bevins, a pathologist, had on two occasions sought all of this physical evidence for testing and had not been given the blood and some of the contents of the six medicine bottles.
At the hearing held by the judge, out of the presence of the jury, Dr. Bevins and Dr. Paul Cobb, the Supervisor of the Louisiana State Police Laboratory, testified. The defense sought to establish by the testimony of Dr. Bevins that he visited the lab on two occasions for the purpose of securing samples of all of this physical evidence but was told, as to the contents of the six medicine bottles, that there was not a sufficient quantity of medicine therein for testing. There was an intimation that he was never given the blood for analysis. Cobb testified that Dr. Bevins was given all he requested and at no time was he denied access to any of the evidence in the possession of the State.
After hearing, the judge ruled that the defense was not denied access to any of the phsycial evidence. It was his appreciation that Dr. Bevins, on his first visit, neglected to obtain all of these materials, and he made a second visit to the lab. However, at no time was he restricted in any way nor was he told that the material was not available to him. The reasons state:
"I think that the State has proven beyond any preponderance of the evidence, beyond a reasonable doubt, that Dr. Bevins was given anything that he wanted. And if he had in fact desired samples of the medicine, he would of have been given some." [sic]
A fair appreciation of the testimony of Dr. Bevins and Dr. Cobb is that it was the opinion of both, after viewing the contents of the six medicine bottles, that there was an insufficient quantity of liquid in them for Dr. Bevins to take a sample. The blood was shown to Dr. Bevins, but apparently he made no request for same. The excised organs were presented to Dr. Bevins for examination, and he was given samples of that which he requested. He was also given samples of the hair and toenail.
No showing has been made that defendant was denied an independent examination of the physical evidence in the possession of the State, contrary to the order of this Court and the mandate of State v. Migliore. Thus, this bill is without merit.
Bill of Exceptions No. 11 (Specification of Error No. 5) complains of rulings by *646 the trial judge admitting into evidence, over the defendant's objections, five vials of blood, a toenail, hair clippings, and certain tissue samples of body organs allegedly of the decedent, Richard Flood. Objection was made that the State failed to establish a chain of custody for each of the items objected to.
Defendant objected to the introduction of the toenail and hair clippings because the only testimony as to the origin of these items was that of Dr. Leslie Walker, the attending physician, who testified that he instructed an unnamed person to go to the funeral home and secure these items. The State failed to produce the person who, in fact, took these samples. Further objection was made to the introduction of the vials of blood on the ground that there is no evidence of the origin of the blood. Dr. Hunt, who performed the autopsy, stated he did not draw the blood but assumed that it was blood taken from the decedent while hospitalized immediately prior to his death.
Not only was the origin of the blood not established, defendant submits that it was mishandled in that it was kept in an unlocked freezer in Dr. Hunt's laboratory for an extended period of time, then transported to an unlocked refrigerator at the Terrebonne Parish Sheriff's Motor Pool where it was overlooked when the box containing the organs was removed and taken to the crime lab at Baton Rouge. The blood was transported to the lab some sixteen days later.
While the handling of the physical evidence leaves much to be desired in the establishment of the chain of custody, it nevertheless appears when the testimony is taken as a whole, that this evidence was properly admitted.
We stated in State v. Gladden, 260 La. 735, 257 So.2d 388 (1972) that:
"The chain of custody or connexity of the evidence is a matter for the jury to decide, so long as the objects introduced are shown to be reasonably connected with the defendant or the crime and have some relevancy which the trial judge considers sufficient to warrant their introduction into evidence. State v. McQueen, 257 La. 684, 243 So.2d 798 (1971); State v. Pesson, 256 La. 201, 235 So.2d 568 (1970); State v. Coleman, 254 La. 264, 223 So.2d 402 (1969)."
In State v. Dotson, 260 La. 471, 256 So.2d 594 (1971), we held:
"To admit demonstrative evidence at a trial, the law requires that the object be identified. The identification can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case. It can also be identified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it is offered in evidence.
"The law does not require that the evidence as to custody eliminate all possibility that the object has been altered. For admission, it suffices if the custodial evidence establishes that it is more probable than not that the object is the one connected with the case. A preponderance of the evidence is sufficient. State v. Coleman, 254 La. 264, 223 So.2d 402; State v. Martin, 250 La. 705, 198 So.2d 897; State v. Bertrand, 247 La. 232, 170 So.2d 386.
"The lack of positive identification goes to the weight of the evidence, rather than to its admissibility. Ultimately, connexity of physical evidence is a factual matter for determination by the jury. State v. Wright, 254 La. 521, 225 So.2d 201; State v. Whitfield, 253 La. 679, 219 So.2d 493; State v. Progue, 243 La. 337, 144 So.2d 352; 2 Wharton's Criminal Evidence (12th ed.), § 673, p. 617."
The two items which are questioned in regard to the chain of custody are the five vials of blood allegedly taken from decedent and the toenail and hair samples taken *647 at the funeral parlor. According to the record, Dr. Leslie Walker requested Dr. Hunt (the physician performing the autopsy) to preserve certain organs and blood for later analysis. Dr. Hunt did not recall retrieving any blood at the time of the autopsy. To the best of his recollection, the blood was drawn from Mr. Flood during his hospitalization prior to his death, at which time, a large number of lab tests were performed. However, he did recall personally taking the blood sample, along with the organs, back to New Orleans with him. In regard to the toenail and hair clippings, Dr. Walker testified that, through his instructions at the funeral parlor, a toenail and hair clippings taken from Richard Flood were delivered to his office where they were placed in safekeeping until given by him to Captain LeBoeuf of the Police Department for transmittal to the crime lab for analysis.
From a totality of the evidence, we find that it is more probable than not that the blood, toenail and hair clippings were taken from the decedent.
Bill of Exceptions No. 11 is without merit.
Bill of Exceptions No. 12 (Specification of Error No. 6) questions the correctness of the ruling allowing the State, during direct examination, to ask three witnesses (Mrs. Calpurnia Meredith, Mrs. Jesse Morales and Mr. Andrew J. Landeche) information concerning illicit relations engaged in by defendant with other men.
It is the position of the defendant that the use of evidence of defendant's bad reputation is prohibited except in rebuttal of the evidence introduced by the accused to show good character. R.S. 15:481.[4]
Generally, the State cannot introduce evidence of the character of an accused until the accused puts in evidence of his character. However, in State v. Hagan, 178 La. 127, 150 So. 852 (1933), it was considered proper to admit evidence of illicit intercourse by defendant with another in her trial for administering poison to her husband with intent to murder. This evidence of illicit relations was considered properly admitted for the purpose of proving motive. This Court stated:
"Illicit intercourse is a strong circumstance for the jury to consider in the motive prompting the accused to desire to remove her husband in order that she might become the undisturbed mistress or even the wife of her paramour. Underhill on Criminal Evidence (3d Ed.) p. 207; Wharton's Criminal Evidence (10th Ed.) p. 1652."
See State v. Leming, 217 La. 257, 46 So.2d 262 (1950). It is stated in 40 CJS Homicide § 229, p. 1160:
"Loss of Affection for Spouse; Infatuation with Another
"Where the victim of the crime is the spouse of the accused evidence tending to show want of affection, infatuation with another, or improper relations with persons of the opposite sex on the part of the accused is admissible to show motive."
State v. Hagan is cited along with cases from other jurisdictions. The reason for this rule, as stated in the cases, is that evidence of this character tends to repel the presumption of love and affection that arises out of the marital relation, and to establish a motive for the desire to get rid of one who, under normal conditions, would be the natural object of kindness and protection.
It should be pointed out that subsequently counsel for defendant stipulated that a State witness, David Coignet, had had sexual relations with defendant on two occasions while her husband was off at camp on National Guard duty. Furthermore, *648 this witness then testified without objection that he had had sexual relations with defendant on one occasion about two months after the death of her husband. Also, defendant admitted on direct examination that she had gone to bed with numerous men before her husband died. She also admitted having sexual relations with other men within two or three months after his death. Certainly, under these circumstances, it could hardly be said that defendant was prejudiced by the previously objected-to testimony.
Bill of Exceptions No. 12 is without merit.
At the completion of the State's case, defense counsel moved for a directed verdict of not guilty because of the State's failure to produce any evidence of the crime charged. Bill of Exceptions No. 13 (Specification of Error No. 7) was reserved to the trial judge's denial of this motion.
Article 778 C.Cr.P. provides in pertinent part:
"In a jury trial the court may direct a verdict of not guilty of one or more of the offenses charged, on its own motion or on that of a defendant, after the close of the state's evidence or of all the evidence, if the evidence is insufficient to sustain a conviction."
We stated in State v. Douglas, 278 So.2d 485 (La.1973):
"* * * We hold that the language in Article 778 `* * * if the evidence is insufficient to sustain a conviction' refers to a situation in which the prosecution has produced no evidence to prove a crime or an essential element."
Whether defendant murdered her husband by arsenic poisoning is a matter of proof by direct or circumstantial evidence. However, the question of sufficiency of this evidence is a matter, not for the court, but for a jury. It is only where there is no evidence at all to prove the crime charged or an essential element thereof that the court may direct a verdict of not guilty.
We have carefully reviewed the 800 pages of testimony covering the State's case in chief in order to determine whether some evidence was produced to prove the crime charged. In order to properly appreciate the unique nature of the evidence in this case, we consider it necessary to set forth a summary of the State's evidence in some detail.
Richard and Ellen Flood were married in 1965. At the time of Richard's death on June 2, 1972, he was about 27 years old. Richard was described as a healthy robust man about 5'-10", weighing about 190 pounds with a "fantastic build." Defendant was described as good-looking. Mr. Flood was employed at Transcontinental Gas Pipeline Company as a maintenance man earning an annual salary of $8,745.00. Defendant was employed at Houtz Insurance Agency as an underwriter of personal casualty insurance, with a salary of $475.00 per month. The couple lived in a house trailer. The evidence is that defendant was unhappy in marriage and was having sexual relations with other men. There is further evidence that, during April of 1972 (about two months prior to Richard's death), defendant made inquiry in regard to obtaining a $100,000.00 life insurance policy on the life of her husband. The inquiry included questions by her as to whether her husband would have to be apprised of the policy. She was given an affirmative answer to this line of questioning. The evidence reveals that thereafter no further action was taken by her in regard to the policy.
Richard Flood had two life insurance policies. One was a group policy through his employment calculated at three times his annual base pay ($8,745.00), or about $25,000.00. The other policy was a $5,000.00 whole life type policy with a $5,000.00 declining term rider, under which policy, the beneficiary would receive approximately $9,300.00 at the time of Flood's *649 death. The ownership of this latter policy was changed from Richard Flood to Ellen Flood on August 2, 1971. Defendant was the beneficiary under both of these policies.
On May 21, 1972, the Floods and their small child went to a movie, "The Godfather," at Southland Cinema. Defendant purchased three hot dogs, two Cokes and an orange. The Cokes were pumped from a machine which mixes the syrup and carbonated water to form the Coke. Defendant later returned to the concession stand complaining that the Coke tasted bad and her husband was sick. There was testimony that the Coke tasted and smelled bad. Defendant took part of the Coke with her while the theater retained the balance. The theater was crowded that day, but there were no other complaints of bad Cokes. The concession stand was checked out by the State Department of Health on that afternoon and the following day. Nothing improper was found. A sample of the Coke left with the theater was sent to the health lab for analysis. The report was negative.
Mr. & Mrs. Flood were seen later that afternoon at the emergency room of the Terrebonne General Hospital. Their stomachs were pumped, and the Coke which they had taken from the theater was analyzed. This report was likewise negative. Defendant was also seen the next day in the emergency room of the hospital. She still had complaints and mentioned that her husband had been vomiting and had diarrhea at that time. Defendant indicated she thought that she and her husband had been poisoned at the theater the night before.
On June 1, Mr. Flood was seen by the doctor, complaining about vomiting, diarrhea and nausea. Later that day, he was admitted to the hospital. His doctor ordered that he be given no food and intravenous feeding was begun. Mr. Flood was looking better that evening. His hospital room was changed about 10:30 p. m., as another patient had been moved into the room with him. No one was occupying the room to which he was then moved. The testimony is uncertain as to whether defendant suggested this move.
The next morning (June 2), Flood's condition had improved. When the doctor walked into his room at about 8:00 a. m., defendant was feeding him ice out of a spoon. The doctor testified: "I asked her what the hell she was doing. The guy was supposed to be on nothing." The doctor was recalled to the hospital about noon, at which time he found Mr. Flood in extreme pain, vomiting, etc. His condition was deteriorating rapidly. Mr. Flood was transferred to intensive care where he died at 2:30 p. m. Immediate cause of death was listed as pulmonary edema; however, undisputed testimony is that the cause of death was arsenic poisoning. When defendant was informed of her husband's death, she said: "Okay, thanks." There is evidence that Father Leopold, who was present at that time, commented that he had never seen anyone with a like reaction. Later, defendant inquired of the doctor as to the cause of death. He informed her that he thought her husband died of arsenic poisoning. Upon questioning Mrs. Flood as to her knowledge of the possibility of arsenic poisoning, she mentioned that a couple of days prior to his death, her husband's breath smelled of almond. However, she said he had eaten trout almondine.
The doctor requested an autopsy and the preservation of blood, as well as samples of body organs to check for arsenic poisoning. This doctor also instructed the funeral home to secure a toenail and hair clippings to check for arsenic poisoning. Results of tests performed on these items revealed a high concentration of arsenic which was far more than necessary for a lethal dose.
Execution of the search warrant (August 14) at the trailer where the couple had lived produced six medicine bottles. Analysis of their content revealed a small *650 concentration of arsenic in each bottle. The State produced evidence that the medicines corresponding to the labels on these bottles contain no arsenic.
On May 25 (about a week before Flood's death), defendant called the Sheriff's office complaining about having received threatening phone calls on the prior day. Defendant told the investigating officer that the caller stated: "Flood, I am going to get you." She stated she had received a similar call at her office. Mr. Flood indicated that he had heard no voice on the phone. Police officers attached a tape recorder to the phone at the trailer (May 25); however, no subsequent threatening calls were received.
Mr. Flood informed the police officer that he and his wife had returned to the Southland Cinema on May 29 to see the balance of the film they missed on the previous occasion. When advised they were out of Coke, defendant purchased an orange drink for her husband. Mr. Flood thought it tasted "syrupy and funny." Later that night at home, he became nauseous with headaches. Mr. Flood attributed his condition to overeating. He mentioned that he had eaten trout with almond that night. On May 30, defendant related she received a call at her office identical to the one previously received. This time, the caller stated: "It was an orange this time but Flood I am still going to get you." Another witness' version of what defendant said regarding this call was: "First the Coke and now the orange." Defendant requested several employees at her office to listen in on some of these calls, but no one ever heard anything.
A fellow employee of defendant testified that defendant told her she was unhappy in her marriage and was going out with other men. This witness asked her why she did not leave Richard. Defendant's response was that: "She [was] afraid to leave him," that she could not "leave him and live." The same witness testified that around May of 1972, defendant told her she had a feeling that a dark cloud was hanging over her and something terrible was going to happen. The next day, defendant said that she thought it was going to happen to her husband. This was about three weeks to a month before his death. This witness also testified that defendant stated they were eating out during the last week prior to Richard's death. The reason she gave for this action was that she thought it was possible someone would come into their house trailer and put poison in their food, as it was never locked. There was testimony that defendant called another employee at the agency on one occasion to come over and follow her to a friend's home because her husband had a gun and she was frightened.
There was also evidence that on May 31, defendant called an exterminator to come to her trailer to spray for mice and roaches. When he arrived that day, she said that her husband was sick, but he could go in and spray then or come back later. He informed her that he would check with her on the following afternoon. On returning the next day (June 1), no one was home. He did spray the interior of the trialer on June 16 and July 14 (subsequent to Flood's death). He testified that there was no arsenic in any of the materials used.
Richard Flood was seen by his doctor as late as May 10 and 18 for an unrelated matter. On neither of these occasions did he mention any of the complaints of cramps in his stomach, vomiting and diarrhea which subsequently developed. Also, Richard attended a track meet about May 15 with his father who testified that his general appearance was fine at that time.
Without attempting to point out the significance of the aforesaid evidence, we simply say that there is some evidence upon which the jury could reasonably conclude that defendant murdered her husband by arsenic poisoning. The motive was there. She was unhappy and going out with other men. There was some evidence that she was fearful of her husband. Further, *651 her attempt to take out a large life insurance policy on his life without his knowledge is certainly evidence which indicates a motive, as well as the fact that she would receive about $35,000.00 as the beneficiary under the other two policies then in effect. There is also some evidence upon which the jury could conclude that she did, in fact, administer the arsenic. The evidence that six medicine bottles found in her trailer contained arsenic is revealing. This is particularly significant in view of the fact that the medicines called for by the labels on these bottles would not have contained any arsenic. Two of the medicines in these bottles, tylenol and paregoric, are the types which the jury could infer that Flood was taking for relief of headaches and diarrhea, some of the symptoms of his illness. Also noteworthy is the evidence of defendant feeding Richard ice at the hospital when no feeding had been ordered. At that time, his condition had been improving; however, from then on, he deteriorated and died several hours later. Finally, there is no dispute that he died of arsenic poisoning. The remaining evidence is also directed at proving the crime charged.
As previously mentioned, we need not concern ourselves with the sufficiency of this evidence, for this is a matter, not for the court, but for the jury, to determine. We must simply find that the prosecution has presented some evidence to prove each and every element of the crime charged. We have no difficulty in making such a finding here. Thus, the trial judge correctly denied defendant's motion for a directed verdict of not guilty.
Bill of Exceptions No. 13 is without merit.
During the examination of the defense witness, Dr. Milton Helpern, a forensic pathologist, stated that, in his opinion, the death of Richard Flood was caused by acute arsenic poisoning. Thereupon, defense counsel asked him to give an opinion as to whether the death of decedent was accidental, suicidal or homicidal. Objection by the State was sustained. Bill of Exceptions No. 14 (Specification of Error No. 8) was then reserved.
We are satisfied that the ruling of the trial court was correct, as the question called for an opinion without any foundation in the facts presented at trial. Any opinion as to whether the death of Richard Flood by arsenic poisoning was suicidal, accidental or homicidal would be purely an assumption on the part of this witness and beyond his expertise.
In any event, Dr. Helpern had previously testified in full, without objection, to the percentage of suicidal deaths by poisoning as compared to the percentages of accidental and homicidal deaths due to poison. Thus, no prejudice was suffered by the defendant as a result of this ruling.
Bill of Exceptions No. 14 is without merit.
Bill of Exceptions No. 16 (Specification of Error No. 9) was reserved when the trial judge denied the motion for a new trial filed on behalf of defendant. This motion is based upon two grounds: (1) the verdict returned is contrary to the law and evidence; and (2) the State being allowed to introduce character evidence on its case in chief was in violation of R.S. 15:481.
This Court has repeatedly held that an allegation that the jury verdict is contrary to the law and evidence presents nothing for review. State v. Asher, 294 So.2d 223 (La.1974); State v. Barnard, 287 So.2d 770 (La.1974); State v. Vincent, 284 So.2d 563 (La.1973); State v. Landry, 262 La. 32, 262 So.2d 360 (1972); and State v. Grey, 257 La. 1070, 245 So.2d 178 (1971). Thus, the first ground for a new trial lacks merit.
The second contention in this motion has been urged in Bill of Exceptions No. 12 (Specification of Error No. 6) and rejected.
*652 The motion for a new trial was properly denied by the trial judge. Bill of Exceptions No. 16 is without merit.
We note from the record that the proper delay between the denial of the motion for a new trial and the sentencing was not allowed as provided for in Article 873 C.Cr.P. However, counsel for defendant, both in brief and in argument before this Court, expressly waived his right to a remand for re-sentencing.
For the reasons assigned, the conviction and sentence are affirmed.
TATE, J., concurs, although of the opinion that the defendant, a woman, was denied the equal protection of the laws by the effective exclusion of women from the jury. However, this Court has consistently rejected this contention.
DIXON, J., dissents.
CALOGERO, J., dissents.
BARHAM, J., dissents for reasons assigned by DIXON, J.
DIXON, Justice (dissenting).
I respectfully dissent.
A search warrant may not be issued unless there is a sworn affidavit presented to the judge that states the underlying supportive facts which show that probable cause does exist to search the premises. An affidavit based on mere affirmance of belief or suspicion does not satisy the requirement of probable cause. Article 1, § 7, La.Const.1921; 162 C.Cr.P.; Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); State v. Wells, 253 La. 925, 221 So.2d 50 (1969). The majority opinion correctly concludes that the affidavit in question sets forth specific facts. These facts are:
1. That Mr. Flood died on June 2, 1972 of acute pulmonary edema.
2. That on August 14, 1972 the results of laboratory analysis showed that arsenic was present in the body organs and blood of Mr. Flood.
3. That after extensive police investigation Mrs. Flood was charged with the murder of her husband.
The affidavit concludes:
"That affiant has reasonable grounds and probable cause to believe that there is now being concealed in the above described house trailer, all or part of chemical substances containing arsenic,..."
No doubt the policeman who applied for the warrant could have given many more specific facts. He could have stated the color of Mrs. Flood's hair or eyes. Such facts, however, do not make it more probable than not that the arsenic was hidden in the trailer. As Justice Jackson stated in Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948):
"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."
In this case the officer did state specific facts. He did not state specific facts from which the neutral judge could make a reasonable inference that probable cause existed. Instead the officer concluded that probable cause existed without stating the facts which supported the conclusion. The facts stated, taken by themselves, do not establish probable cause as required by the Fourth Amendment to the United States Constitution.
NOTES
[1] Other items were seized but are not an issue in the case.
[2] The briefs refer to specifications of error numbered differently from the reserved bills. The opinion will make reference to both the numbered bills of exceptions reserved in the court below, as well as the specifications of error.
[3] The clippings are from The Houma Daily Courier. The first appeared on August 14, 1972 and referred to the murder charge filed by the district attorney; the second, dated August 16, 1972, referred to the setting of the bond hearing; the third article appeared on December 19, 1972 and dealt with defendant's return to custody resulting from a decision of this Court; the fourth article, dated May 3, 1973, pertained to defendant's attempt to get certain dental work performed while in the parish jail.
[4] R.S. 15:481: "The state is permitted to introduce testimony of the bad character of the accused only in rebuttal of the evidence introduced by him to show good character."