443 So.2d 1091 (1983)
STATE of Louisiana
v.
Willie Lawrence CELESTINE.
No. 83-KA-0916.
Supreme Court of Louisiana.
November 28, 1983.
Rehearing Denied February 2, 1984.
*1092 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Michael Harson, Asst. Dist. Atty., Robin Rhodes, Don Landry, Asst. Dist. Attys., for plaintiff-appellee.
David Clarke, Lafayette, for defendant-appellant.
DIXON, Chief Justice.
On September 23, 1981 a Lafayette Parish grand jury indicted defendant Willie Lawrence Celestine for the first degree murder of Marcelianne Richard, eighty-one years old, in violation of R.S. 14:30. Following the guilt phase of his bifurcated trial, the jury unanimously found defendant guilty as charged. After the sentencing phase, the jury unanimously recommended the death penalty, finding that three aggravating circumstances existed: the victim had been killed during the commission of an aggravated rape; the defendant had previously been convicted of an unrelated aggravated rape; and the offense had been committed in an especially cruel manner. Subsequently, the trial judge sentenced defendant to death. On appeal to this court, Celestine designates five assignments of error. After considering the oral and written arguments of the parties and the evidence on the record, we affirm Celestine's conviction and sentence.
The facts reveal that on September 13, 1981 the Lafayette City Police Department obtained an arrest warrant for Celestine for the aggravated burglary of a house the *1093 previous weekend. Celestine was found at the home of his parents that afternoon. That same evening he waived his rights and gave a taped statement to the police. In the statement, he admitted breaking into three different homes in the Lafayette area and to forcing women on each of those occasions to engage in sexual intercourse with him. As to the crime against Mrs. Richard, he relates in the statement how he had been out all night drinking and taking "speed." Early that morning a friend dropped him off near his house, and he began to walk until he saw a light on in the house of Mrs. Richard whom he claimed not to know. He said he entered through the bathroom window and found Mrs. Richard sitting in the living room. He then put his hand over her mouth, and, after a struggle, "had sex" with her on her bedroom floor. He remembered how she had tried to get to the telephone, knocking it off the hook. He then stated he left through the back door, went home, and slept until the police arrived that afternoon.
On that same morning of September 13, 1981 Mrs. Richard was preparing to visit her sisters. Her friend, Arthur Boulet, called her at 5:30 a.m. to see if she was ready for the trip. Later, at about 6:55 a.m., Boulet, accompanied by his wife and a cousin, drove by Mrs. Richard's home to pick her up. No one answered the front door. Finding the back door open, they entered the house and discovered Mrs. Richard's body lying on the floor of her bedroom. Boulet testified that there was no sign of breathing, that she was without undergarments, that her face was bruised, and that there was bleeding from the nose.
A police officer who investigated the scene substantiated Boulet's testimony and described Mrs. Richard's face as very much disfigured. The investigating pathologist testified that Mrs. Richard died of strangulation. The hialate bone in her neck was broken. To fracture this bone, he testified, required a blow of "tremendous force." He found considerable bruising of the face and neck as well as seven broken ribs. He also found evidence of recent sexual intercourse.
In addition to an edited version of the taped statement (references to the other crimes were deleted), the state introduced a palm print found in Mrs. Richard's bathroom. An expert compared it to Celestine's and found them identical, finding twenty-five points of similarity. Examination and comparison of defendant's seminal fluid and that found near Mrs. Richard's body indicated that the offender and Celestine had similar blood groupings.
Although Celestine claimed not to know Mrs. Richard, he lived one block away with his parents. At the time of the crime, he was twenty-five years old.
The defense attempted to suggest that the confession had been coerced, that the palm prints were suspect, and that defendant was intoxicated to such an extent that it precluded his forming the requisite specific intent to have actively desired either the victim's death or to have inflicted great bodily harm. The defendant did not testify at the trial or at the sentencing hearing.
Celestine's mother testified that he had had six beers before going out on Friday evening at 10:00 p.m. She did not see him until daybreak the next morning. She stated she saw no evidence of tearing or blood on his clothing. Both she and her husband testified that Celestine was difficult to wake up when the police arrived to arrest him at about 5:30 p.m. that evening.
Other friends testified that he had been drinking. The witness to see him last, however, at 3:30 a.m. on the morning of the crime, could not say whether he had been drinking. Defendant, in his statement, said, "I mean that I really didn't mean to do it. Like I said I was full of speed you know and (?) and drinking you know and I just caught myself doing the wrong thing. I don't know what I was thinking about at the time. I was all high." The jury heard this in the edited tape introduced at trial.
Assignment of Error No. 1
By this assignment Celestine argues that a Mrs. Holmes was improperly excused for cause at the insistence of the state, thereby *1094 tainting his jury and violating his right to due process under the principles announced in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
The Supreme Court in Witherspoon, supra at 522, held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Under Witherspoon, only a juror who would automatically vote against the death penalty may be excluded for cause. Id. at 522 n. 21, 88 S.Ct. at 1777 n. 21. "The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." Id. See also C.Cr.P. 798; State v. Jordan, 420 So.2d 420, 423 (La.1982).
We find that Mrs. Holmes clearly stated that she was irrevocably committed to vote against the death penalty and that she expressed much more than general objections or religious scruples against its imposition. For example, she stated to the prosecutor, "I don't feel like I could vote for the death penalty." Her lifelong beliefs would prevent her from imposing the penalty, she said, no matter what the facts and circumstances of the case showed. Defense counsel inquired whether she would:
"... consider all of the laws ... both penalties, including the death penalty in arriving at your decision?
No, sir. I don't think so. I don't think I could."
Later, the prosecutor asked:
"... would you be able to accept that instruction by the Court and consider the imposition of the death penalty?
No, sir."
Near the end of the questioning, the prosecutor asked whether she would:
"... just more or less disregard entirely the death penalty as a possible penalty? And you could not under any circumstances come back with a recommendation of death in the case, regardless of what the facts and circumstances are which are brought out?"
That's right."
Although she did reply affirmatively to several general questions as to her ability to consider the law as told to her by the judge, she nevertheless consistently stated that she could not vote for the death penalty whenever it was specifically mentioned in a question.
This assignment is without merit.
Assignment of Error No. 2
This assignment was neither briefed nor argued; hence it would normally be considered abandoned. However, this court will review all assignments of error in cases where the death penalty has been imposed. State v. Narcisse, 426 So.2d 118, 131 (La.1983). By this assignment Celestine argues that the trial court erred in refusing to excuse a Mrs. Broussard for cause at his request, forcing him to use one of his peremptory challenges.
Since Celestine exhausted his peremptory challenges by the time the jury was completed, he has the right to complain of the trial court's ruling. C.Cr.P. 800; State v. Edwards, 406 So.2d 1331, 1345 (La.1981). However, to be successful, he must show that the trial court abused its broad discretion in an arbitrary and unreasonable way. State v. Edwards, supra.
During voir dire, Mrs. Broussard disclosed that she was a good friend of the victim's granddaughter. She also stated she knew the prosecutor who had represented her father on occasion. She stated several times that she would try to be fair, however, and said that she would try to do her "civic duty." The court asked her if it would embarrass her to face either the prosecutor or the victim's granddaughter in the event of a not guilty verdict. She replied that it would not. She concluded *1095 her interrogation with the following statement: "Well, the way I feel, if he's right, I would vote him right, but if he done wrong, I would vote him wrong." When defense counsel challenged for cause, the trial judge denied, stating:
"... from my interrogation of her, I can find no reason why she can't serve. In other words, it's very hard to find a perfect juror. But one who is candid I would trust a lot more than one who would not tell you. I think she has made a complete disclosure. I will deny the motion."
Upon review of Mrs. Broussard's entire examination, we agree with the trial judge and find no abuse of his broad discretion in denying the motion.
This assignment is without merit.
Assignment of Error No. 3
By this assignment Celestine argues that a vial of blood, allegedly taken from him, was improperly admitted into evidence because the state failed to show a proper chain of custody. In particular, he argues that the doctor who extracted the blood should have testified.
The state relies on State v. Godeaux, 378 So.2d 941 (La.1979), in contending that it proved by a preponderance of evidence that the vial of blood was that taken from the defendant. Defendant counters that this preponderance of the evidence rule should apply only to "ordinary" demonstrative evidence and that a higher standard of proof should be required for blood extracted from a defendant.
At trial two police officers testified who were present when the doctor extracted the blood from the defendant. One officer stated that the blood was drawn and handed directly to him. He then placed it in a container, marked it with his signature, placed it in a refrigerator at his office, and later personally delivered it to a chemist at the crime lab. He recognized his signature and handwriting on the container.
The chemist at the crime lab testified that he received the vial from the officer. He identified the vial by its unique crime lab number. Following his analysis, he testified that he turned the vial over to the custodian of evidence at Lafayette Police headquarters. The custodian testified that he put the vial in the evidence room where it remained until he delivered it to court on the day he testified. The seal was unbroken.
We find that the evidence clearly preponderates in favor of the admissibility of the vial of blood in this case. This assignment is thus without merit.
Assignment of Error No. 4
By this assignment Celestine argues that the court erred in permitting the jury to view pictures of the victim taken at the scene of the crime.
The pictures had been properly admitted into evidence following the testimony of the officer who took them. No objection was made by defense counsel.[1] The photographs were in color and depicted the victim's house, the interior of various rooms in the house, and the position of Mrs. Richard on her bedroom floor. After further testimony, the state rested. Defense counsel called his first witness, Celestine's father. He was sworn, but before any questions were put to him, the prosecutor asked the court for permission to "re-open" the state's case for the purpose of allowing the jury to view the previously introduced photographs. Over defense objection, the court permitted the jury to view the photographs. *1096 The defense then began its questioning of Mr. Celestine.
Under C.Cr.P. 765(5) the trial court is granted discretion to permit the introduction of additional evidence prior to argument. See State v. Bonanno, 373 So.2d 1284, 1293 (La.1979). There is no reason that the court cannot allow the jury to see previously introduced evidence at any time prior to argument. We find no abuse of that discretion in this case. The state had apparently rested only minutes before, and no questions had yet been put to the defense's first witness. Under these circumstances, we find that no prejudice to the defendant resulted.
This assignment is without merit.
Assignment of Error No. 5
By this assignment Celestine complains that it was error to play an edited version of his taped confession rather than the entire tape. He argues that the jury was presented a "distorted and out-of-context picture of the evidence." He does not argue, nor is there any evidence in the record to suggest it, that his confession was coerced or involuntary.[2]
In his taped statement, Celestine confessed to three different rapes. The state proposed either to edit the tape or to introduce a transcription of that portion of the tape relevant to the murder of Mrs. Richard. The trial court offered defendant the choice to play the entire tape or an edited version. He chose the latter. Significantly, Celestine's exculpatory claim that he was so high he did not know what he was doing was left in the edited tape.
This court has consistently held that "when a statement refers to other crimes, a defendant has the option of having only that portion of the statement which pertains to the instant offense submitted as evidence or having the whole statement introduced." State v. Sonnier, 379 So.2d 1336, 1355 n. 7 (La.1979). See also State v. Snedecor, 294 So.2d 207, 210 (La.1974). Defense counsel in this case clearly chose the alternative which did the least prejudice to his client. We find no error in the playing of the edited tape.
This assignment is also without merit.
Death Sentence Review
Pursuant to C.Cr.P. 905.9, this court reviews every sentence of death in this state to determine if it is constitutionally excessive. In making this determination, the law requires that the court consider whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, whether the evidence supports the jury's findings of a statutory aggravating circumstance, and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
The uniform capital sentence report submitted by the trial judge reveals that Celestine is a black male who was twenty-five years old at the time of the crime. He was unmarried and had fathered a child, but had not contributed to its support. His parents owned their own home. His father is a carpenter, and his mother is a domestic. In his teen years his behavior and grades steadily deteriorated. He dropped out of school at age sixteen. His juvenile record reveals five convictions for theft, possession of stolen property, disturbing the peace, burglary and theft of auto. As a result, he spent some eight months at the Louisiana Training Institute. In 1975 he joined the Army. He was dishonorably *1097 discharged in 1979 for, according to Celestine, disobeying orders. Thereafter, he worked as a carpenter's helper with his father, earning $5.00 an hour. As an adult, he was convicted in 1980 for disturbing the peace by intoxication, and he had two convictions for the aggravated rapes which occurred prior to the rape and murder of Mrs. Richard.
Psychological tests at LTI in 1973 indicated a non-verbal IQ score of 81 and a verbal IQ score of 69. Psychiatric evaluation following his conviction for murder showed an ability to distinguish right from wrong, an ability to adhere to the right, and the ability to assist counsel. His intelligence level was determined to be in the medium range, with an IQ of 77.
The victim lived in his neighborhood; however, defendant claimed not to know her. She was eighty-one years old and had been strangled and beaten during the commission of an aggravated rape.
Passion, Prejudice and Arbitrary Factors
Defendant has made no contention that his sentence was the result of passion, prejudice or any other arbitrary factors. Although he is black and Mrs. Richard was an elderly white woman, the record does not reveal any evidence that indicates his sentence was a result of racial prejudice. Several blacks served on the jury. The record presents no reason to question the jury verdict based on any of these factors.
Aggravating Circumstances
The jury found three aggravating circumstances: the offense was committed in an especially cruel manner; it was committed during an aggravated rape; and the defendant had been previously convicted of an aggravated rape.
The verdict stated that the offense was committed in an especially cruel manner. The evidence supports this finding. Even if it did not, the deficiency would not constitute reversible error. The lack of evidence as to one statutory aggravating circumstance does not invalidate the death sentence when other aggravating circumstances found by the jury are supported by the evidence. State v. Narcisse, supra at 138; accord, Zant v. Stephens, ___ U.S. ___, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Accordingly, if the evidence supports either one of the aggravating circumstances, then it is unnecessary to consider either the sufficiency of the evidence on this issue or whether the language chosen by the jury would be sufficient for the purposes of C.Cr.P. 905.4(g). See State v. Mattheson, 407 So.2d 1150, 1168 (La.1981); C.Cr.P. 905.3.
In this case the record clearly shows that Celestine murdered Mrs. Richard in the course of committing an aggravated rape. In his statement he admitted that he entered her home, that he struggled with her, and that he had sex with her. The autopsy findings established the presence of motile spermatazoa in her vaginal tract indicating recent sexual intercourse. The seminal fluid found near Mrs. Richard was compatible with that of Celestine. The testimony and photographs corroborate the sexual nature of the attack and that the victim resisted to the utmost but was overcome by force, satisfying the requirements for aggravated rape under R.S. 14:42. The evidence amply supports the jury finding as to this aggravating circumstance.
Defendant's prior conviction of aggravated rape was also clearly established, but the record does not reflect that the conviction was final. However, proof that the murder was committed in the course of an aggravated rape is sufficient to support the death penalty.
Proportionality
The sentence review memorandum submitted by the state and concurred in by the defendant shows that there have been eight other first degree murder prosecutions in the Fifteenth Judicial District.[3] Of *1098 these eight cases, four have resulted in the death penalty.[4] In those which resulted in life imprisonment, one (Aucoin) involved a mentally disturbed defendant. The other three (Thibeaux, Francis and Thibodeaux) can all be classified as "heat of passion" killings involving, respectively, a thirty-nine year old mother of four for the shooting death of her husband, a man who began shooting when he saw a former girl friend dancing with another man, and a man who shot another man in a pool hall following an argument.
Those cases, however, in which the death penalty was imposed share several characteristics with the present case. The victims in Fuller, Narcisse and Glass were elderly and were attacked in their homes. The murders were committed during an armed robbery. In Watson, the victim was young, and she was the victim of a rape. She was kidnapped and forced to drive to an isolated area, where she was raped anally and vaginally, robbed, then shot in the head from behind.
Considering both the crime and the defendant, the death sentence is not disproportionate to similar cases involving the murder of elderly victims in their homes during the commission of an enumerated felony. In particular, it is not disproportionate with State v. Narcisse, supra, the only one of the four to be finally affirmed as of this date by this court. The jury in this case did not act arbitrarily in comparison with other juries in similar cases recommending the death penalty.
The conviction and sentence are affirmed.
NOTES
[1] Defense counsel did object to the photographs after the jury had left to deliberate as being inflammatory and having no probative value in light of the testimony describing the scene. Even though we are not called on specifically to review this issue, we nevertheless find any objection on this basis meritless. A trial court's ruling on the admissibility of such photographs will be disturbed only if their prejudicial effect clearly outweighs their probative value. State v. Germain, 433 So.2d 110, 118-19 (La.1983). Such photographs are generally admissible to prove a corpus delicti, to corroborate other evidence, to establish a cause of death, to establish the identity of the victim, or to establish the number and severity of the wounds. State v. Brogdon, 426 So.2d 158, 169 (La.1983). We find no error in the trial court's ruling.
[2] The statement was made after full advisement and waiver of his rights. Celestine said so in the tape, and he signed a waiver form which is in the record. At trial defense counsel was relegated to asking suggestive questions to police officers on cross-examination, such as, "You didn't threaten to break his arm if he didn't make a statement?" Several officers testified, none of them raising even a hint of coercion. In light of the absence of evidence by the defense on this issue, the lack of any defense objection, and the affirmative evidence presented by the state that the confession was given voluntarily and without coercion, there is no doubt that the state carried its burden in showing that Celestine's custodial interrogation and the statement it produced was in full compliance with Miranda. C.Cr.P. 703(C); State v. Narcisse, 426 So.2d 118, 125 (La.1983).
[3] State v. Aucoin, 362 So.2d 503 (La.1978); State v. Thibeaux, 366 So.2d 1314 (La.1978) (reversed due to the trial court's ruling which limited the amount of evidence of prior physical abuse; case is still pending below); State v. Francis, 403 So.2d 680 (La.1981); State v. Thibodeaux, 383 So.2d 1264 (La.1980) (life imprisonment affirmed per curiam); State v. Narcisse, 426 So.2d 118 (La.1983); State v. Watson, 423 So.2d 1130 (La.1982) (death penalty vacated due to improper jury instruction; upon resentencing death penalty was again recommended and the case is now pending before this court, No. 81-KA-2227); State v. Fuller, (presently on appeal to this court, No. 83-KA-0619); State v. Glass (presently on appeal to this court, No. 83-KA-1735).
[4] Narcisse, Watson, Fuller and Glass.