573 So.2d 223 (1990)
Leroy WELLS
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY.
No. 89/CA/0712.
Court of Appeal of Louisiana, First Circuit.
December 18, 1990.
*224 Richard Thalheim, Jr., Atty., Thibodaux, for plaintiff-appellant Leroy Wells.
Robert B. Butler, III, Schwab & Butler, Houma, for defendant-appellee State Farm Mut. Auto. Ins. Co.
Before COVINGTON, C.J., LOTTINGER, WATKINS, SHORTESS, CARTER, SAVOIE, LANIER, CRAIN and FOIL, JJ., and VIAL LEMMON[*], J. Pro Tem.[**]
SAVOIE, Judge.
Plaintiff, Leroy Wells, filed suit to recover damages he sustained in a vehicular collision on March 28, 1986. Named as defendants were C.J. and Martha Billiot and State Farm Mutual Automobile Insurance Company, owner, driver, and insurer of the other vehicle involved in the collision. After trial on the merits, the judge rendered judgment for the defendants. From this judgment, Wells appeals.

FACTS
On March 28, 1986 at about 2:30 p.m. on a clear, dry day, Wells was proceeding south in his 1976 Dodge Monaco on Louisiana Highway 316 (Bayou Blue Road) in Bayou Blue, Louisiana. Martha Billiot, in a 1978 Ford F-100 pickup truck owned by C.J. Billiot, accompanied by her friend Betty Jo Strickland, was heading north on the same highway. The two vehicles collided near the center line of the two-lane roadway, with the Billiot vehicle coming to rest mostly in the southbound lane and the Wells vehicle coming to rest across both lanes.

TRIAL TESTIMONY
At trial, Wells and Billiot gave different explanations for the collision. Wells testified that he was proceeding south in his lane when he saw Billiot coming toward him and into his lane; when he realized Billiot was actually coming into his lane, he veered over into the northbound lane, but he could not avoid the collision.
Billiot and Strickland both gave basically the same testimony as to the cause of the accident. Billiot testified that as she was proceeding north in her lane, she saw Wells pull out of his lane to pass the vehicle in front of him; she took some evasive action, but Wells did not pass the vehicle and went back into his lane. Wells then pulled out to pass the other vehicle again, and again he did not complete the passing maneuver. Because Wells was in her lane, Billiot went to the right onto the shoulder. Because Wells seemed to follow her, after the car preceding Wells passed her, Billiot drove towards the other lane (which Wells had formerly occupied). As Billiot tried to move into the other lane, Wells also moved back to his lane and the vehicles collided near the center line.
Dana Harrison, a Louisiana state trooper who investigated the collision, testified that *225 he accepted the Billiot version of the accident. The remainder of the trial testimony concerned Wells' damages, the blood alcohol testing, and Wells' alcohol consumption. We will discuss the testimony concerning these latter two topics under Assignment of Error No. 2.

TRIAL JUDGE'S REASONS FOR JUDGMENT
After reviewing the testimony and evidence, the trial judge stated that in order to decide the case he must either accept or reject Wells' version of the accident. The judge then reasoned as follows:
The facts and evidence indicate that Wells is the only person who accepts his version of the accident and the attendant circumstances. He offered no corroborating evidence or testimony, either as to accident itself or his supposed intoxication. This Court, like Trooper Harrison, accepts the Billiot/Strickland version as being the more reasonable and probable. It is unlikely that Wells could have seen the defendant's truck, almost a half-mile away, as he was passing the other vehicle. He then claims to have watched her progress for over 800 feet before the collision. That account, together with the expert testimony and test results of his alcohol consumption, lead this Court to the conclusion that Ms. Billiot's version of the accident is not only more probable than Wells', but is likely the actual events of that day. Further, the fact that the vehicles came to rest after the collision more in the Wells' lane than the other does not indicate to this Court in which lane the accident happened. While plaintiff went to great length at the trial to emphasize this point, the Court cannot draw this conclusion without expert reconstruction testimony.
Plaintiff did not call any witness who was with him at the crawfish boil to rebut the inference that he was intoxicated at the time of the accident. Further, his plea of guilty to reckless operation of a motor vehicle creates a rebuttable presumption that he did, in fact, operate his vehicle in such a manner on that day. LA.R.S. 13:3739
In addition to the plaintiff failing to prove his case by a preponderance of the evidence, the preponderance of the evidence is to the other extreme, that he was at fault in causing the collision.

ASSIGNMENTS OF ERROR
On appeal, Wells raises the following assignments of error:
1. It was manifest error for the trial court to fail to presume fault against the left-turning motorist and to ignore the physical evidence, improperly consider number of witnesses, improperly be influenced by trooper credibility perspective and erroneously fail to find liability against defendant.
2. The trial court erroneously allowed introduction of blood test results of alcohol consumption without proper foundation and the testing procedure itself was inaccurate; the trial court was in error to rely upon such results in its decision.
We will discuss Assignment of Error No. 2 first.

ASSIGNMENT OF ERROR NO. 2: ADMISSIBILITY OF BLOOD ALCOHOL TEST RESULTS
Harrison, the Louisiana state trooper who investigated the collision, testified that when he arrived at the scene, he noticed the odor of alcohol on Wells' breath and in his car, that what appeared to be a mixed drink was spilled in Wells' car, and that Wells' eyes were glassy. After Wells was taken to the hospital for treatment of his injuries, Harrison questioned him; Wells said that he had a prescription for muscle relaxants, but had not taken any, and that he had a beer with lunch before the accident. According to the affidavit of Harrison for Wells' arrest for driving while intoxicated, "Leroy Wells said he was driving and had been drinking prior to the accident." In the affidavit, Harrison also stated that he observed that Wells had glassy eyes, moderate alcoholic breath odor and slurred speech.
*226 Based on his observations, Harrison ordered a blood test to determine Wells' blood alcohol content (BAC). Harrison advised Wells of his rights relating to the blood test; Harrison testified that Wells said he understood his rights, but refused to sign the form indicating that he had been advised of them. This form was introduced into evidence as Exhibit D-2. According to Exhibit D-2 and Harrison's testimony, Jana Dover, the nurse who took Wells' blood, witnessed that Wells had been advised of his rights, but refused to sign the form. Harrison also signed the form.
Harrison then witnessed the nurse draw blood from Wells. He testified that he took the vials of blood, sealed and initialed them, and placed them in a styrofoam box. Harrison testified that after he put the seals on the vials, he did not tamper with them. The styrofoam box was then sealed, initialed, and marked with Wells' name and pertinent information. Harrison testified that although he could not recall his procedure in this case, he usually takes the styrofoam box to Troop "C" in Gray, where it is placed in a locked box. Harrison testified that in this case, after he brought the styrofoam box containing the vials of blood to Troop "C", he had no further dealings with it.
The defendants introduced D-7, an exhibit which was a xerox copy of the two vials of blood and the label on the outside of the styrofoam container in which the vials were kept. The label showed that the subject was Leroy Wells, that the police officer was T.F.C. D. Harrison, and that blood was drawn on March 28, 1986 at 4:25 p.m. at Terrebonne General Houma by Jana Dover, R.N. The label also contained a section called "Chain of Possession." This section showed that Harrison received the blood from Jana Dover, R.N. on March 28, 1986 at 4:27 p.m. and that S/T G.A. Whitney received it from Harrison on March 31, 1986, at 8:00 a.m. The label was filled out by Harrison, with the exception of the March 31 entry and the Crime Lab's notations; Harrison and Dover initialed the label.
When Harrison was asked whether he brought the blood to Troop "C" on the same day he received it, or on March 31, he testified that he was not sure. Harrison could not say where the vials of blood were from March 28 through March 31.
According to Harrison, also in the styrofoam box containing the vials of blood were Exhibit D-8, a request for scientific analysis, and Exhibit D-9, a consent form and blood collection report. Exhibit D-8 shows that Harrison submitted two vials of blood from Leroy Wells for blood alcohol testing to the State Police Crime Laboratory in Baton Rouge. The document bears the signature of Libby Guillory, the criminalist receiving the evidence, showing that the blood was received by mail on April 2, 1986 at 3:30 p.m. Exhibit D-9 shows that Wells refused to give permission for blood samples to be taken on March 28, 1986 at 1623 p.m. The exhibit also shows that the blood was taken from Wells at 4:25 p.m. on March 28, 1986 at Terrebonne General Hospital. J. Dover, R.N. signed the form certifying that she drew the blood and Harrison signed the form stating that he witnessed the blood being drawn from Wells by Dover.
Paul L. Cobb, Jr., a forensic scientist with and director of the Crime Lab Toxicology Unit who was accepted by the court as an expert in blood alcohol analysis and forensic toxicology, testified that on April 4, 1986, he examined the blood and found that BAC was .14 percent. Cobb testified that Exhibit D-7 shows that the Crime Lab's evidence technician assigned a number, SP1507-86, to the blood, added the date and time, April 2, 1986 and 3:30 p.m., and signed her initials. When Cobb opened the kit to analyze the blood, he wrote "SP1507-86 PC sealed" and initialed it. He testified that when he received the blood, the vials were sealed and that he did not see anything to indicate that the vials had been improperly sealed or handled. Cobb wrote "SP1507-86" on both vials of blood and his initials are visible on one vial. He analyzed the blood using gas chromatographic head space analysis.
*227 On cross-examination, Cobb testified that the "only way that blood will manufacture alcohol to my knowledge is upon fermentation if the blood is putrefied ..."; he said the blood alcohol kits furnished by the state police have preservatives in the vials; he said that he did not find preservatives in Wells' blood and that he did not know whether the vials containing Wells' blood had the preservatives. Cobb testified that when he analyzed the blood, it was in good condition.
Cobb testified that he was not present when Wells' blood was drawn; he testified that every registered nurse is qualified to withdraw samples for blood alcohol analysis, based on the statutes dealing with blood alcohol testing. When asked if there was a wrong way to extract blood for a blood alcohol test, Cobb responded: "I do not draw blood myself. I know, I feel as long as they get the blood." When asked whether it made a difference if the area from which the blood was drawn was sanitized, Cobb said that the blood alcohol kits contain a non-alcoholic swab for the person drawing the blood to swab the arm if desired. Cobb testified that if the arm were swabbed with rubbing alcohol, it would not make a difference in the blood test results.
The law regarding introduction of blood test results into evidence was set forth in our recent opinion, Allemand v. Zip's Trucking Co., 552 So.2d 1023, 1026 (La. App. 1st Cir.1989), writ denied, 558 So.2d 569 (La.1990).
The requirements for the introduction of a blood test analysis are very stringent; the party seeking to introduce such evidence must first lay a proper foundation for its admission. Pearce v. Gunter, 238 So.2d 534 (La.App. 3d Cir.), application not considered, 256 La. 888, 239 So.2d 543 (La.1970). This predicate must connect the specimen with its source, show that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis and properly tested. Pearce v. Gunter, 238 So.2d at 537.
"The purpose of the chain of custody rule [as a proper foundation for admission of the blood test results] is to assure the integrity of the evidence, i.e., to prevent the evidence from being tampered with or from being lost." Bufkin v. Mid-American Indemnity Co., 528 So.2d 589, 592 (La.App. 2d Cir.1988). (Citation omitted).
Applying these requirements to the case sub judice, we find that the defendants did not lay a proper foundation for admission of the test results.[1] The defendants did not show that the blood was properly taken, properly preserved, and properly transported for analysis. We find it particularly disturbing that the nurse who actually drew the blood did not testify at the trial, to show that the blood was properly taken; furthermore, no one could testify as to the whereabouts or security of the vials between March 28 and March 31 or between March 31 and April 2. "Unless proof is made of the proper preservation of the blood sample between the time it is taken and its testing, the subsequent results are unreliable evidence and properly excluded." Allemand, 552 So.2d at 1027. (Citations omitted). Therefore, we find *228 that the trial judge erred in considering the results of the blood alcohol test because the defendants did not lay a proper foundation for the introduction of the evidence;[2] because of this finding, we pretermit any discussion of whether the trial judge erred in considering the blood test results based on Wells' contention that the testing procedure was inaccurate.[3]
While we find that the trial judge improperly considered Wells' blood alcohol test results, we find that such error was harmless because there was other evidence on which the trial judge could base his finding that Wells was intoxicated at the time of the accident. According to Trooper Harrison's testimony and his affidavit, at the scene of the accident, he noticed the odor of alcohol on Wells' breath and in his car, that what appeared to be a mixed drink was spilled in Wells' car, and that Wells' eyes were glassy and his speech was slurred. Furthermore, Wells told Harrison he had been drinking prior to the accident. Wells testified at trial that he had two beers before the accident at a crawfish boil. Finally, Wells pled guilty to reckless operation of a motor vehicle in connection with the accident.
Additionally, the blood test results showing that Wells was legally intoxicated were only one factor which led the trial court to reject Wells' version of the accident. Other factors which led the trial court to reject Wells' testimony were that Wells offered no corroborating evidence to support his testimony and that Wells' version of the accident was unlikely (i.e., he claimed to have seen the Billiot vehicle almost a half-mile away as he was passing another vehicle).

ASSIGNMENT OF ERROR NO. 1: TRIAL COURT'S FAILURE TO FIND DEFENDANTS AT FAULT
After reviewing the testimony and evidence, we cannot say that the trial court erred in accepting the Billiot version of the accident and finding Wells at fault. Recently, the supreme court set out our standard of review in the case of Rosell v. ESCO, 549 So.2d 840, 844-845 (La. 1989)
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong....
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder [sic] would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and *229 a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
(Citations omitted).
Wells contends in brief that the trial judge erred in failing to presume negligence on the part of Billiot since he claims that she was turning left in front of his oncoming vehicle; in his reply brief, Wells contends that the trial judge erred in failing to presume negligence on Billiot's part because she was in his lane when the collision occurred. These contentions have no merit since the evidence shows that Billiot was in the lane Wells had occupied because she was attempting to avoid a collision with him since he was in her lane. Assignment of Error No. 1 has no merit.
For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal to be paid by Wells.
AFFIRMED.
FOIL, J., concurs.
LANIER and LOTTINGER, JJ., concur and assign reasons.
COVINGTON, C.J., and VIAL LEMMON, J. Pro Tem., concur for reasons assigned by LANIER, J.
LOTTINGER, Judge, concurring.
I concur in the result because I find no error in the admission into evidence of the results of the blood alcohol test.
LANIER, Judge, and VIAL LEMMON, Judge Pro Tem., concurring.
We concur in the result reached by the majority. For the reasons hereinafter set forth, we believe the blood alcohol test results in the instant case were properly admitted into evidence.
The admissibility of evidence is a question of law determined by the court. See cases cited in Comment (a) for La.C.E. art. 104. When factual questions must be decided to determine the admissibility of evidence, the court should follow the preponderance of evidence standard, unless a special rule of law requires a different standard. See authorities cited in Comment (c) for La.C.E. art. 104. The admissibility of the results of a blood alcohol test is controlled generally by the evidentiary rules pertaining to authentication and identification of evidence. Cf. La.C.E. art. 901.
The general law applicable to admissibility of demonstrative evidence, such as a blood sample or an illegal drug, is set forth in State v. Sweeney, 443 So.2d 522, 528 (La.1983), as follows:
To admit demonstrative evidence at trial, the law requires that the object be identified. The identification can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case. It can also be identified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence.... The law does not require that the evidence as to custody eliminate all possibilities that the object has been altered. For admission, it suffices if the custodial evidence establishes that it is more probable than not that the object is the one connected with the case. A preponderance of the evidence is sufficient.
Establishing an unbroken chain of custody is not essential for the admissibility of demonstrative evidence as long as the foundation evidence as a whole shows it is more probable than not that the demonstrative evidence was that which was originally taken. State v. Davis, 411 So.2d 434 (La. 1982); State v. Mitchell, 311 So.2d 888 (La.1975). If the foundation evidence as a whole shows it is more probable than not that the demonstrative evidence tested was that which was originally taken, gaps in the chain of evidence affect the weight of the evidence and not its admissibility. State v. Brown, 337 So.2d 484 (La.1976); State v. Bridgewater, 450 So.2d 1075 (La. App. 1st Cir.1984). Questions pertaining to how the blood sample was taken, preserved and transported do not relate to the authenticity. (admissibility) of the sample; these factors relate to what weight should be given to the test performed on the sample. The fact that a blood sample is no *230 longer available to be introduced into evidence at trial (as in the instant case) does not necessarily preclude the admissibility of the results of tests performed thereon. State v. Foret, 447 So.2d 1265 (La.App. 1st Cir.1984).
This is a civil case, not a criminal case, and the special rules of La.R.S. 32:661 et seq. do not apply. La.R.S. 32:662(C); Pereira Enterprises, Inc. v. Soileau, 551 So.2d 39 (La.App. 1st Cir.1989). However, a litigant in a civil action may prove intoxication by introducing evidence of a person's blood alcohol content and expert testimony interpreting the effects of such a level (content) on the person's ability to operate a motor vehicle. Parker v. Kroger's, Inc., 394 So.2d 1178 (La.1981); Clay v. Bituminous Casualty Corporation, 401 So.2d 1257 (La.App. 1st Cir.1981), writ denied, 409 So.2d 616 (La.1981).
Generally, the same rules of evidence apply in civil cases as in criminal cases, unless otherwise provided for by law.[1]Cf. La.C.E. art. 1101. This is particularly true with reference to evidentiary rules pertaining to identification and authentication of evidence. Cf. La.C.E. art. 1101(D). However, after reviewing the authorities cited by the plaintiffs and the defendants on this issue, it appears that what constitutes a proper foundation for the admissibility of test results of a blood sample and what factors relate to the weight of this evidence in a criminal case, may not be the same as in a civil case. Compare the cases cited by the majority herein with State v. Celestine, 443 So.2d 1091 (La.1983); State v. Turner, 392 So.2d 436 (La.1980); State v. Flood, 301 So.2d 637 (La.1974); and State v. Coleman, 254 La. 264, 223 So.2d 402 (1969).
We do not perceive of any rule of law or reason why there should be differing standards for the admissibility of blood sample test results in civil and criminal (or juvenile) cases. Whether a case is civil involving negligence or comparative negligence, or criminal involving a felony or a misdemeanor, the rules concerning the admissibility of the result of a blood test should be the same (except insofar as La.R.S. 32:661 et seq. or other special laws are applicable). Further, the factors that relate to the weight of the evidence also should be the same. To the extent that opinions of the Courts of Appeal are in conflict with the opinions of the Louisiana Supreme Court, they should not be followed.
The majority has ruled that "the trial judge erred in considering the results of the blood alcohol test" because "the nurse who actually drew the blood did not testify at the trial, to show that the blood was properly taken" and "no one could testify as to the whereabouts or security of the vials between March 28 ... and April 2". These holdings are in conflict with holdings of the Louisiana Supreme Court.
In Celestine, the defendant was charged with first degree murder, convicted and sentenced to death. At the trial, evidence was introduced which showed that examination and comparison of Celestine's seminal fluid and that found near the victim's body indicated that the offender and Celestine had similar blood groupings. In Celestine, 443 So.2d at 1095 appears the following:
Assignment of Error No. 3
By this assignment Celestine argues that a vial of blood, allegedly taken from him, was improperly admitted into evidence because the state failed to show a proper chain of custody. In particular, he argues that the doctor who extracted the blood should have testified.

The state relies on State v. Godeaux, 378 So.2d 941 (La.1979), in contending that it proved by a preponderance of evidence that the vial of blood was that taken from the defendant. Defendant counters that this preponderance of the evidence rule should apply only to "ordinary" *231 demonstrative evidence and that a higher standard of proof should be required for blood extracted from a defendant.

At trial two police officers testified who were present when the doctor extracted the blood from the defendant. One officer stated that the blood was drawn and handed directly to him. He then placed it in a container, marked it with his signature, placed it in a refrigerator at his office, and later personally delivered it to a chemist at the crime lab. He recognized his signature and handwriting on the container.
The chemist at the crime lab testified that he received the vial from the officer. He identified the vial by its unique crime lab number. Following his analysis, he testified that he turned the vial over to the custodian of evidence at Lafayette Police headquarters. The custodian testified that he put the vial in the evidence room where it remained until he delivered it to court on the day he testified. The seal was unbroken.

We find that the evidence clearly preponderates in favor of the admissibility of the vial of blood in this case. This assignment is thus without merit. (Emphasis added)
See also State v. Lambert, 550 So.2d 847 (La.App. 2nd Cir.1989). Since the Louisiana Supreme Court has held that it is not necessary to have a doctor (medical person) who took a blood sample testify in a murder case which resulted in the death penalty, and, thus, the testimony of a witnessing police officer was sufficient, it appears to us to be inconsistent and absurd to hold that in a tort case the testimony of the medical person who took a blood sample is sacramental to admissibility. Thus, in State v. Grier, 307 N.C. 628, 300 S.E.2d 351, 353-354 (1983) appears the following:
Dr. Rita Kay Williams examined the victim shortly after the rape on 22 September 1981. She testified that although she did not actually see the blood drawn from Mrs. Lee, she signed a blood sample that was supposedly taken from the victim by a laboratory technician either immediately before or after the examination. The technician who drew the blood did not testify.
Defendant, relying on Robinson v. Life and Casualty Ins. Co., 255 N.C. 669, 122 S.E.2d 801 (1961), argues that the chain of custody was insufficient to permit submission of evidence concerning the blood test. His position is that the person who actually draws the blood specimen must testify in order to lay a proper foundation for the admission of this evidence.
We do not interpret Robinson to hold that the person who draws the blood must testify in every case in order to establish a proper foundation for the admission of this evidence.
. . . . .
Here, as in [State v.] Detter [298 N.C. 604, 260 S.E.2d 567, 588 (1979) ] the possibility that Mrs. Lee's blood sample was confused with someone else's is simply too remote to require exclusion of this evidence. Any weakness in the chain of custody relates only to the weight of the evidence and not to its admissibility. Id. This assignment of error is overruled. (Emphasis added)
The majority opinion implies that the testimony of the nurse "who actually drew the blood" was necessary "to show that the blood was properly taken". The facts contained in the majority opinion show this without the nurse's testimony. The majority opinion correctly states as fact that the blood samples were taken at the Terrebonne General Hospital on March 28, 1986, at 4:25 p.m. by Jana Dover, a registered nurse, in the presence of Trooper Harrison. The opinion also shows that Paul L. Cobb, Jr., who was qualified as an expert in blood alcohol analysis and forensic toxicology, testified "that when he received the blood, the vials were sealed and that he did not see anything to indicate that the vials had been improperly sealed or handled", "every registered nurse is qualified to withdraw samples for blood alcohol analysis, based on the statutes dealing with blood alcohol testing", and "that when he analyzed the blood, it was in good condition." If this is *232 not sufficient to show that the blood samples were properly taken, the majority should tell the bench and the bar what is necessary to show they were properly taken.
The majority also holds that "[T]he defendants did not show that the blood was... properly preserved, and properly transported for analysis." They observe that "no one could testify as to the whereabouts or security of the vials between March 28 and March 31 or between March 31 and April 2." These holdings raise many questions. Cobb specifically testified that "[T]he blood when I analyzed it was in good condition ...". Transcript pages 404 and 409. Further, Cobb testified the blood kit was sealed when he received it and showed no signs of tampering. Transcript page 416. This testimony was obviously accepted by the trial court. If the blood was in good condition when it was tested, how can it be held that it was not properly preserved or properly transported for analysis? Could the blood be improperly preserved and improperly transported and still be suitable (in good condition) for testing? If the blood is improperly preserved and improperly transported, but, nevertheless is in "good condition" for testing, is the improper preserving and improper transportation relevant? What constitutes proper preservation and proper transportation?
We do not agree with the factual statement by the majority that "no one could testify as to the whereabouts or security of the vials between March 28 and March 31 or between March 31 and April 2". Trooper Harrison gave the following pertinent testimony:
BY MR. BUTLER: (witness answering)
A. What happened was is that I take the vials of blood and they are sealed and initialled and then they are placed in a styrofoam box, that is sealed and initialled and prepared and marked with the driver's name and the pertinent information. Then that is taken by me to Troop "C", and that is placed in, in Gray, and that is placed in a locked box where nobody can get in it and tamper with it. And then from there the blood is gotten to Baton Rouge.
Q. Did you yourself carry the blood from Mr. Wells to Troop "C"?
A. Yes, sir, I did.
Q. Do you know how many vials there were?
A. No, sir, not to my recollection at this time.
Q. After it was delivered to Troop "C", was it placed in this container that you described?
BY MR. THALHEIM:
I'm going to object. Is he asking from the witness', own personally having done it or seen it done or is he asking him a general procedure. I object to the question as not clear.
BY MR. BUTLER:
I'm asking him from his own personal knowledge what was done with it when he got to Troop "C".
BY MR. BUTLER: (witness answering)
A. That's exactly how it was handled, but I took it to Troop "C" and I put it in the evidence box.
Q. And what kind of container do you have the vials placed in?
A. It's a large box with a lock on it, and they have a trooper assigned at the Troop and that's all he does is take care of this, the vials of blood that are submitted by the other troopers.
Q. Okay, after you submitted it, and delivered it to Troop "C" and had it placed in this container, were you yourself involved in taking it to Baton Rouge?
A. No, sir, I was not.
Q. So that's the last dealings, that you saw, personally had with the blood?
A. Yes, sir.
. . . . .
BY MR. BUTLER:
Q. Do you know when, were you there when Trooper Whitney received it?
A. No, sir, I was not.
Q. When you put it in the evidence or, what did you put it in, evidence what?

*233 A. The evidence locker at the Troop where all the blood alcohol kits are kept, that's where I put it and he is the one that was handling it then. He removes them all and prepares them from there.
Q. As part of the procedures, he was the guy that would normally take these things out of the evidence locker and send them out?
A. Yes, sir.
Q. And when you put it in there, it had all the writing except for what on it?
A. Where it says received from and he put his name and date and everything when he got it, he put all that in there. I put everything else on the whole thing.
Q. Did you deliver it to the State Police Headquarters in Gray, on the same day that you got it? Or would it have been that 3/31 date?
A. I'm not sure when it was placed in there, to be perfectly honest with you. When it was placed inside the thing. I kept it either in my personal possession or put it inside there; I don't know when he got it to be perfectly honest with you. It should be the 3/31 date but I'm not sure.
. . . . .
CROSS EXAMINATION
BY MR. THALHEIM:
Q. Officer.
A. Yes, sir.
Q. The sample that we are talking here was taken on the 28th?
A. Yes, sir.
Q. It was given to you on the 28th?
A. Yes, sir.
Q. You didn't transfer to Sergeant Whitney until the 31st, correct?
A. He has here that he received it. I can't tell you when I put it in the box, but normally I would prepare the stuff and put it in the box and it's locked and it's not able to be tampered with where it's at at the Troop. That's when he picked it up. As far as the difference between the 20th [sic] and the 31st, I have no explanation.
Q. Okay, and you have no explanation for where that, those vials were?

A. No, they were in the box. They were locked in the box, that's where I placed them and that's where he retrieved them from but I don't know why, you know why it took him three days to get them.

Q. Okay. Do you have some record that shows that you put them in the box on the 28th as opposed to the 31st?
A. No, not really.
Q. And you don't recall, do you?
A. No, I don't.
Q. So you might have kept custody of those things yourself for three days?

A. Yes, I have no recollection of it. Normally what I would do is put them in there, but I.
Q. I understand that.
A. Okay. All right. Sure.
Q. But this record shows, a three day unexplained gap.
A. Okay. Okay.
Q. So we really aren't in the position to tell the Court what happened to those things for three days? Correct?
A. Correct.
(Emphasis added)
A reasonable construction of this testimony is that during the period of March 28, 1986, to April 2, 1986, the vials of blood were either in Trooper Harrison's personal possession or in the locked evidence box at Troop "C" Headquarters. Trooper Harrison testified he sealed the blood sample kit and did not tamper with the blood samples. Cobb testified the blood sample kit was sealed when it was received at the crime laboratory, the kit showed no signs of tampering and the blood was in "good condition". This evidence is sufficient to show that the blood taken from Wells was that which was tested by Cobb. The majority conclusion to the contrary is wrong.
The majority holding that the 5 day gap in the chain of custody is fatal to the admissibility of the evidence is contrary to the jurisprudence from the Louisiana Supreme Court. In State v. Flood, 301 So.2d *234 637 (La.1974), the defendant was charged with murder, convicted and sentenced to life imprisonment. At the trial, evidence that five vials of blood taken from the victim were analyzed and shown to contain arsenic was used to show death by poisoning. The defendant objected to the admission of this evidence asserting that the blood "was mishanded in that it was kept in an unlocked freezer in Dr. Hunt's laboratory for an extended period of time, then transported to an unlocked refrigerator at the Terrebonne Parish Sheriff's Motor Pool where it was overlooked ..." and "... was transported to the lab some sixteen days later." Flood, 301 So.2d at 646. The court at Flood, 301 So.2d 646-647 upheld the admissibility of the evidence with the following rationale:
The two items which are questioned in regard to the chain of custody are the five vials of blood allegedly taken from decedent and the toenail and hair samples taken at the funeral parlor. According to the record, Dr. Leslie Walker requested Dr. Hunt (the physician performing the autopsy) to preserve certain organs and blood for later analysis. Dr. Hunt did not recall retrieving any blood at the time of the autopsy. To the best of his recollection, the blood was drawn from Mr. Flood during his hospitalization prior to his death, at which time, a large number of lab tests were performed. However, he did recall personally taking the blood sample, along with the organs, back to New Orleans with him. In regard to the toenail and hair clippings, Dr. Walker testified that, through his instructions at the funeral parlor, a toenail and hair clippings taken from Richard Flood were delivered to his office where they were placed in safekeeping until given by him to Captain LeBouef of the Police Department for transmittal to the crime lab for analysis.
From a totality of the evidence, we find that it is more probable than not that the blood, toenail and hair clippings were taken from the decedent.
In State v. Coleman, 254 La. 264, 223 So.2d 402, 404-405 (La.1969), a case very similar to the instant case, appears the following:
At the trial the district attorney offered to introduce in evidence the vial containing what he contended was a sample of appellant's blood. Defense counsel objected, asserting that it was inadmissible because the evidence did not establish a continuous chain of custody, control and supervision of the vial from the time Dr. Martin took the blood sample from appellant on September 9, 1967, until the vial containing blood was delivered to Dr. Butler on September 20, 1967 to ascertain its alcoholic content.

The evidence on this point is essentially uncontradicted. Dr. Martin, a deputy coroner of Bossier Parish, withdrew the sample of blood from appellant's arm in the emergency room of Bossier City General Hospital on September 9, 1967, the night appellant killed Gregg Wood. The blood, under the accepted procedure, was drawn into a 10cc. vacu-tube, a glass tube or vessel with a rubber cap used to collect blood samples. As the name implies, the air is removed from these tubes to avoid possible contamination of the blood and they contain a chemical to prevent clotting. Dr. Martin then inserted appellant's name, the time when the blood was collected and the date of the accident on a form provided for the purpose, which also contained appellant's written consent to the withdrawal of the blood sample. Thereafter he labeled the tube with appellant's name and address and signed the tape label for later identification if necessary.
The vial was then given to Mrs. Janice Robbins, the nurse on duty, who wrapped it in the paper containing appellant's written consent and stored it in a refrigerator to await transfer to Dr. Butler, the forensic pathologist, who customarily made the blood analysis. Mrs. Robbins did not testify at the trial and there is some question as to where the vial was stored, in the emergency room or the laboratory. This question has never been satisfactorily answered. It is undisputed, however, that the compartment, *235 where the vials were in all probability stored, were unlocked and accessible to any number of people in the hospital.
As was usual in these cases, a city policeman, Captain Thibodeaux, was called forprobably by Dr. Martinon September 20 to deliver the vial to Dr. Butler. Dr. Butler made the analysis, attached his label and retained the vial until it was produced at the trial. He testified that there was nothing about the tube to indicate it had been tampered with and, in his opinion, the blood had not been substituted. There was, therefore, nothing suspect to make him believe that the blood was not the blood of appellant.
Concededly there was a span of time, while the vial was in the refrigeration compartment at the Bossier City General Hospital before it was transferred to Dr. Butler, when the blood could have been withdrawn and other blood substituted. For, though the vial was sealed, we understand the cover is rubber, which implies it can be penetrated by a hypodermic needle after which it reseals itself. A syringe, therefore, could have removed the blood in the vial and with it a substituted blood sample could have been inserted. Thus, it is not a question of authenticating the vial as being the one Dr. Martin used, but, instead, the question is whether the blood is the same.
It is, of course, mere speculation to say the blood sample was substituted. Not one scintilla of evidence supports this view. The sole reliance of the defense is upon the bare fact that adequate supervision and control was lacking from September 9 to September 20. At least we agree the State has not proven supervision or control during this period and the law places this burden upon the State. Without some proof that the blood sample analysed [sic] was the same as that withdrawn from appellant, the sample and testimony concerning its analysis would be inadmissible.
The evidence amply supports the fact that a blood sample was taken by Dr. Martin from appellant and the evidence amply supports the fact that the vial brought to court by Dr. Butler is the same vial used by Dr. Martin. It is uncontradicted in the evidence, too, that Dr. Butler obtained part of the blood from this same vial to make the analysis. (Emphasis added)
The instant case is almost identical to State v. McKinney, 605 S.W.2d 842, 845-846 (Tenn.Crim.App.1980) wherein the court observed as follows:
The appellant argues that the chain of custody of the blood sample was never established and that it was not proved that the sample tested was the one taken from him. The evidence shows otherwise. The investigating officer testified that the nurse took the blood sample at his direction and under his supervision at about 4:30 p.m. on May 22nd and that he saw her seal the vial of blood in a box. He said that he took the box to the toxicology lab at the University of Tennessee Hospital and gave it to a technician who labeled it and put it in the refrigerator. The toxicologist at the Tennessee Crime Laboratory who analyzed the blood testified that a hospital employee delivered the sample to him at 3:00 p.m. on May 30, 1978. Although there was testimony that an eight-day lapse between receipt of a sample at the toxicology lab and delivery to the crime lab was unusual, there was no evidence that the sample tested was not the sampe [sic] drawn from the appellant after the accident. We find that, under Ritter v. State, [3 Tenn.Cr.App. 372] 462 S.W.2d 247, 249-250 (1970), the trial court did not abuse its discretion in holding that the chain of custody was properly established.
Finally, the majority has failed to consider other evidence in the record which shows Wells' blood alcohol level. After the accident, Wells was initially treated at the Terrebonne General Hospital in Houma, Louisiana, by Dr. Pete H. Rhymes. Wells was subsequently transferred to the South Louisiana Medical Center (SLMC). At the trial Wells filed in evidence the hospital records of SLMC. In these records is a *236 "Lab Results Report" dated March 28, 1986, of an alcohol-ethyl blood test apparently ordered by Dr. Rhymes which shows that Wells had an alcohol-ethyl level of 159 MG/DL (milligrams per deciliter) or 0.159 grams per 100 cubic centimeters. A copy of this hospital record is attached hereto as Appendix A. La.R.S. 13:3714 provides as follows:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the record is sought to be used may summon and examine those making the original of said record as witnesses under cross-examination.
(Emphasis added)
The "Lab Results Report" is prima facie proof of its contents. State v. Berluchaux, 522 So.2d 600 (La.App.1988) State v. Stevenson, 447 So.2d 1125 (La.App. 1st Cir.1984).
For the foregoing reasons, we concur in the result reached by the majority.
*237 
NOTES
[*] Judge Mary Ann Vial Lemmon of the 29th Judicial District Court is serving as Judge pro tempore by special appointment of the Louisiana Supreme Court to fill the vacancy created by the illness and subsequent death of Judge Steve A. Alford, Jr.
[**] Judge Wallace A. Edwards has recused himself from hearing this case and Judge Daniel W. LeBlanc did not participate in the hearing of this case.
[1] For cases where blood alcohol test results were held inadmissible due to inadequate chain of custody, see the following: Allemand v. Zip's Trucking Co., Inc., 552 So.2d 1023 (La.App. 1st Cir.1989), writ denied, 558 So.2d 569 (La.1990); Bufkin v. Mid-American Indemnity Co., 528 So.2d 589 (La.App. 2d Cir.1988); Richardson v. Continental Insurance Co., 468 So.2d 675 (La. App. 3d Cir.), writ denied, 474 So.2d 1304 (La. 1985); Holmes v. Christopher, 435 So.2d 1022 (La.App. 4th Cir.), writs denied, 440 So.2d 723, 724, 765 (La.1983); Swanson v. Estate of Augusta, 403 So.2d 118 (La.App. 4th Cir.), writ denied, 407 So.2d 732 (La.1981); Lapoint v. Breaux, 395 So.2d 1377 (La.App. 1st Cir.), writ denied, 399 So.2d 611 (La.1981).

For cases where blood alcohol test results were held admissible, see the following: Harris v. Browning-Ferris Industries Chemical Services, Inc., 635 F.Supp. 1202 (M.D.La.), aff'd, 806 F.2d 259 (5th Cir.1986); Lawless v. New Orleans Police Department, 550 So.2d 252 (La.App. 4th Cir.), writ denied, 551 So.2d 1344 (La.1989); Hutson v. Madison Parish Police Jury, 496 So.2d 360 (La.App. 2d Cir.), writ denied, 498 So.2d 758 (La.1986); Ryan v. State of Louisiana, 477 So.2d 110 (La.App. 1st Cir.), writ denied, 478 So.2d 136 (La.1985); Young v. All American Assurance Co., 243 So.2d 894 (La.App. 3d Cir.), writ refused, 258 La. 349, 246 So.2d 197 (1971).
[2] We note that State v. Flood, 301 So.2d 637 (La.1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975) and State v. Honeyman, 560 So.2d 825 (La.1990), may allow the introduction of blood alcohol test results in criminal cases where it is more probable than not that the blood sample was taken from the defendant, allowing the defects in the chain of possession to go to the weight of the evidence. However, this rationale does not apply as to the initial taking of the sample or later testing procedure. In Honeyman, the court stated that blood alcohol results may be excluded where there is no evidence of careful adherence to strict procedures in administering intoxication tests. Honeyman, 560 So.2d at 829.
[3] Wells cites State v. Rowell, 517 So.2d 799 (La.1988) to support his contention that the testing procedures were inadequate.
[1] There is a distinction between the rules of evidence applicable in civil and criminal cases and the burdens of proof applicable in them. Thus, in a criminal case, even though the facts necessary to establish the standard of admissibility for a blood alcohol test result need only be proved by a preponderance of the evidence, the State must still prove the guilt of the defendant of the crime charged (where intoxication is an element of the crime) beyond a reasonable doubt.